UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

KATHY A. ROCK,                              )
                                            )
          Plaintiff,                        )
                                            )
          v.                                )        Civil Action No. 13-11594-NMG
                                            )
CAROLYN W. COLVIN,                          )
Acting Commissioner of Social Security,     )
                                            )
          Defendant.                        )
_____    )

**REPORT AND RECOMMENDATION ON PLAINTIFF'S MOTION
TO REVERSE OR REMAND THE COMMISSIONER'S DECISION, AND
DEFENDANT'S MOTION TO AFFIRM THE COMMISSIONER'S DECISION**
[Docket Nos. 17, 24]

March 11, 2014

Boal, M.J.

This is an action for judicial review of a final decision by the Commissioner of the Social

Security Administration (the "Commissioner" or "SSA") denying the application of Kathy A.

Rock ("Rock") for Social Security Disability Insurance benefits ("DIB") and Supplemental

Security Income benefits ("SSI").  Rock asserts that the Commissioner's decision, memorialized

in a March 22, 2013 decision of an administrative law judge ("ALJ"), is in error.  Docket No. 17.

The Commissioner, in turn, has moved to affirm.  Docket No. 24.  This Court heard oral

argument on the motions on February 27, 2014.  For the reasons stated herein, this Court

recommends that the District Court deny Rock's motion and grant the Commissioner's motion.[1]

_____

[1] On December 27, 2013 and February 18, 2014, the District Court referred the parties'
motions to this Court for a report and recommendation.  Docket Nos. 19, 26.

I.      FACTUAL AND PROCEDURAL BACKGROUND

   A.      Procedural History

   Rock filed applications for DIB and SSI on May 27, 2011 due to post traumatic stress

disorder ("PTSD"), depression, anxiety, back pain, and a right foot fracture, and alleged a

disability onset date of October 15, 2009.  (AR 191, 193, 221, 226).[2]  Her applications were

denied initially and on reconsideration.  (AR 65, 66, 119, 120).  At Rock's request, a hearing was

held before an ALJ on March 13, 2013.  (AR 31, 149).  At the hearing, Rock amended her

alleged disability onset date to July 8, 2010.  (AR 12, 220).  Rock appeared with counsel and

testified, as did a vocational expert ("VE").  (AR 31-64).  On March 22, 2013, the ALJ issued a

decision finding that Rock was not disabled from July 8, 2010, through March 22, 2013. (AR

23).  On March 29, 2013, Rock filed a request for review of the ALJ's decision.  (AR 8).  The

Appeals Council denied Rock's request on May 3, 2013 (AR 1-4), making the ALJ's decision

the final decision of the Commissioner.  20 C.F.R. §§ 404.955, 404.981.  Rock has exhausted her

available administrative remedies, and the case is now ripe for review under 42 U.S.C. § 405(g).

   B.      Background

   Rock was forty-three years old as of July 8, 2010.  (AR 191).  She graduated from high

school and completed training to be a certified nursing assistant.  (AR 39, 227).  She has past

relevant work as a cashier, a store assistant manager, and a certified nursing assistant.  (AR 38,

77).

   C.      Medical And Opinion Evidence

      1.      *Physical Impairments*

   Rock fell down a flight of stairs on or about July 8, 2010.  (AR 36, 692).  She was

initially treated at the South Shore Hospital emergency room, where she was diagnosed with a

---

[2] "AR _" refers to the Administrative Record.  Docket No. 16.

low back contusion and a head injury.  (AR 697).  At that time, she had a normal gait and her neurological exam was grossly intact.  (AR 693).  She was prescribed Motrin and a few Vicodin for severe pain, as well as a muscle relaxer Flexeril, and was instructed to follow up with her primary care physician.  (AR 696-97).  At a July 14, 2010 examination with Dr. Kirk D. Stevens, Rock reported that she was having trouble sleeping on her left side, but that the prescribed medication helped.  (AR 690).  On July 28, 2010, Rock reported that her pain had improved, she was no longer taking Vicodin, and she had no numbness.  (AR 688).  She also had normal range of motion in her neck and 5/5 strength in her upper extremities.  (Id.).

An August 6, 2010 MRI of Rock's lumbar spine showed that she had T11-T12 and L1-L2 through L5-S1 spondylosis,[3] without limiting central spinal stenosis[4] or significant lateralizing disc herniations; mild bilateral L3 neuroforaminal[5] stenosis; an extra-axial T11 and T11-T12 cyst arising in the dorsal epidural space and extending into the left T11 neural foramen; and a 3.3 cm L5 vertebral body hemangioma.[6]  (AR 761).  On August 21, 2010, Rock was examined by Fathalla Mashali, M.D. at New England Pain Associates.  (AR 716).  Rock reported ongoing low back pain with a pain scale number of 9 out of 10.  (Id.).  Dr. Mashali diagnosed Rock with lumbago and thoracic/lumbosacral neuritis.  (AR 717).

---

[3] T11-T12 designates the juncture of the 11th and 12th plate in the thoracic spinal region. Dorland's Illustrated Medical Dictionary, ("Dorland's") Plate 40 at 1724, 32nd Edition 2012. L5-S1 designates the juncture of the lowest plate in the lumbar spinal region with the highest bone in the sacral spinal region.  Id.  L1-L2 designates the juncture of the two highest bones in the lumbar spinal region.  Id.  Spondylosis is a degenerative joint disease affecting the cervical or lumbar vertebrae and invertebral disks, causing pain and stiffness. Id. at 1754.

[4] Stenosis is an "abnormal narrowing of a duct or canal."  Dorland's at 1795.

[5] Neur(o) is a combining form denoting relationship to a nerve or nerves, or to the nervous system.  Dorland's at 1263.  Foramen is a natural passage or opening; the anatomic nomenclature for such a passage, especially one into or through a bone. Id. at 729.

[6] Hemangioma is a general term denoting a benign or malignant vascular malformation. Dorland's at 831.

On August 31, 2010, medical consultant Swaran Goswami, M.D., opined that Rock is capable of light work, except she is limited to occasionally operating foot controls with her right lower extremity; she can only occasionally climb ramps or stairs but can never climb ladders, ropes, or scaffolds; she could only occasionally balance, stoop, kneel, crouch, or crawl; and she needs to avoid concentrated exposure to extreme cold, heat, humidity, pulmonary irritants, and hazards.  (AR 351, 352, 354, 357).

A February 19, 2011 MRI of Rock's lumbar spine revealed mild bulging discs at L5-S1, L4-L5, L3-L4,[7] and L1-L2, with no evidence of mass effect on the exiting nerve roots, an extra dural[8] cyst at the T11-T12 level and an L5 vertebral hemangioma.  (AR 707).  On February 24, 2011, Rock was examined by John Chi, M.D., a neurosurgeon at Brigham and Women's Hospital.  (AR 433).  Dr. Chi explained that Rock's vertebral hemangioma at L5 was most likely a benign process potentially contributing to some of her back pain that did not require surgical intervention at that time.  (Id.).

Meanwhile, Rock continued to see Dr. Mashali.  (AR 724-748).  On July 14, 2011, Dr. Mashali diagnosed Rock with chronic low back pain and lumbosacral neuritis.  (AR 752).  Rock's impairments were aggravated by walking, reaching, lifting, standing, and sitting.  (Id.).  Accordingly, Dr. Mashali opined that Rock could not sit, stand, or walk for long periods of time, that she may require frequent position changes, and that she could not lift, bend or kneel.  (Id.).  She was taking oxycodone and oxycontin, which helped to relieve most of her pain.  (Id.).

---

[7]  L3-L4 designates the juncture of the second and third bones in the lumbar spinal region.  Dorland's at 1724.

[8] Dural is the outermost, toughest, and most fibrous of three membranes (meniges) covering the brain and spinal cord.  Dorland's at 573.

4

During an October 18, 2011 musculoskeletal examination performed at New England Pain Associates, Rock exhibited tenderness and a slight decrease in range of motion of the lumbar spine. (AR 869). She also displayed a normal gait and station. (Id.). Inspection of her upper and lower extremities was normal, and Rock had normal range of motion, normal joint stability, and normal strength and muscle tone. (Id.). At that time, she reported that her pain control was adequate. (Id.). On December 13, 2011, she was once again noted to have a normal gait and station and reported that her pain was adequately controlled. (AR 874).

On January 27, 2012, Rock underwent a neurosurgical consultation with John Shin, M.D. (AR 957). Dr. Shin noted that Rock did not have any focal or lateralizing neurological signs and that her strength was 5/5 throughout. (Id.). She also did not have any problems with sensation and her gait was normal. (Id.). Upon reviewing her MRI results, Dr. Shin observed that he did not see "any evidence of any concerning pathological findings." (Id.). He encouraged Rock to increase her activity and to pursue physical therapy. (Id.). He also stated that he did "not see any need for further neurosurgical followup regarding the findings of dorsal at T11-T12 as well as the L5 hemangioma." (Id.).

On March 6, 2012, a physical examination conducted at New England Pain Associates showed that Rock's gait and station continued to be normal and that her pain control was adequate. (AR 1368).

On March 21, 2012, Mark Weiner, M.D., a board certified neurologist, examined Rock. (AR 1023). Rock explained that she suffered from ongoing lower back pain but that her symptoms were relieved through medication. (AR 1024). Dr. Weiner noted that Rock had limited lumbar flexion and a severe lumbar contusion casually related to her July 2010 fall. (Id.). He performed a straight leg raise test, which resulted in increased lumbar pain radiating to her

buttock region.  (Id.).  He also noted that she did not have any focal motor sensory or cerebellar deficits, her reflexes were full and symmetric, and her gait was normal.  (Id.).  Dr. Weiner opined that Rock had a "4% impairment of [her] whole person."  (AR 1025).

Rock continued to see Dr. Mashali throughout early 2013.  (AR 1315-26).  Dr. Mashali's notes reveal that Rock experienced pain and tenderness in her back during this time, with decreased range of motion and muscle spasms, but that her muscle strength was 5/5 and there was no evidence of nerve root disease.  (AR 1316, 1319, 1322, 1325).

On March 31, 2013, Dr. Mashali completed a Physical Residual Functional Capacity Questionnaire.  (AR 1379-84).  He explained that Rock had a poor prognosis and could barely walk after using her pain medications.  (AR 1379).  He noted that Rock's pain and other symptoms were constantly severe enough to interfere with her attention and concentration.  (AR 1380).  He opined that Rock could only sit for fifteen minutes at a time and for less than two hours in an eight-hour day; stand for twenty minutes at a time and for less than two hours in an eight-hour day; she had to walk for ten minutes every half hour; she had to have the option to alternate between sitting and standing at will; she needed to take unscheduled breaks of fifteen to thirty minutes at least four times per day; she had to keep her legs elevated to twenty degrees for forty to fifty percent of the workday; she could occasionally lift less than ten pounds but never more than ten pounds; she could never stoop or crouch; and she would likely be absent from work about four times per month.  (AR 1381-83).[9]

---

[9] The medical records also show that Rock has intermittently sought treatment for migraine headaches, shoulder pain, and knee pain.  Rock, however, did not allege that her ability to work was limited by these potential impairments.  (See AR 35, 226).

2.    *Mental Impairments*

At some point prior to March 30, 2010, Rock was diagnosed with anxiety and depression, and prescribed Paxil and Klonopin.  (See AR 316).  On March 30, 2010, Rock told her primary care physician that her medication was working well.  (AR 316).  Treatment records from South Bay Mental Health Center ("South Bay") indicate that Rock began participating in therapy on June 30, 2010.  (AR 851).  On August 18, 2010, consultant John Warren, Ed.D., opined that Rock did not have a severe mental impairment.  (AR 336).

On September 24, 2010, Rock was discharged from a substance abuse program with Arbour Counseling Services.  (AR 359).  At that time, she was diagnosed with opioid dependence and PTSD and assigned a Global Assessment of Functioning ("GAF") score of 53.[10] (Id.).  A December 30, 2010 Individualized Action Plan – Review/Revision from South Bay lists a diagnosis of generalized anxiety disorder, notes that it appears to be more than situational, and shows that her GAF score was 55.  (AR 825).  A January 31, 2011 Individualized Action Plan (Yearly) from South Bay indicated that Rock was diagnosed with, inter alia, PTSD and major depressive disorder, recurrent, mild.  (AR 1165).  Her GAF score was 62.[11]

---

[10]  Prior to 2013, the GAF scale was used for reporting a clinician's judgment of the individual's overall level of functioning and concerns psychological, social and occupational functioning and, unless otherwise noted, refers to the level of functioning at the time of evaluation.  See Am. Psychiatric Ass'n, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32-33 (4th ed., text revision 2000) (hereinafter DSM-IV).  GAF scores are not used in the fifth edition of DSM.  Nevertheless, because all of the medical opinions of record were issued prior to 2013, the Court will discuss the GAF scores included in those opinions.  In addition, the SSA has expressly indicated that it will continue to receive and consider GAF scores as opinion evidence.  Administrative Message 13066 (July 22, 2013).  GAF scores in the 51-60 range indicate "moderate symptoms" or "moderate difficulty" in functioning.  DSM-IV at 34.

[11] GAF scores in the 61-70 range indicate "mild" symptoms or some difficulty in social, occupational, or school functioning.  See DSM-IV at 34

On February 18, 2011, Rock told her primary care physician that she was feeling better than she had in the past, her therapist had been "helping her a lot," and she was seeing a counselor once a week. (AR 656). On May 23, 2011, she told her therapist, Jennifer Karno, MSW, that her stress and anxiety were decreasing. (AR 807). On July 8, 2011, Rock reported that she had not had a panic attack in a while. (AR 803).

In August 2011, Ms. Karno opined that Rock was having severe panic attacks and was unable to work. (AR 769). She stated that Rock was functioning as a good caretaker for her son. (Id.). She further stated that Rock was able to concentrate and pay attention on most days, although on some days she is overtaken by racing thoughts and panic attacks. (Id.). Rock's family stress level was high, she was unable to manage and at high risk for re-hospitalization due to panic. (Id.). Ms. Karno assigned Rock a GAF score of 55. (Id.). Ms. Karno noted improvement in Rock's mood on September 16, 2011 (AR 795), September 23, 2011 (AR 794), and again on October 14, 2011. (AR 792). At the October 14, 2011 session, Rock reported, "I feel good like things are going well." (Id.). On October 21, 2011, she again reported that she felt "good." (AR 791). On December 2, 2011, Rock had an anxious affect. (AR 787). On January 6, 2012, Ms. Karno again noted that Rock's mood had improved. (AR 881).

On September 22, 2011, Susan Colcher, Ph.D., conducted a consultative examination of Rock. (AR 776). Dr. Colcher diagnosed Rock with anxiety disorder not otherwise specified, and assigned her a GAF score of 60. (AR 779). During the examination, Rock reported that her daily activities included caring for her son, which included getting him ready for school, taking him outside to play, cooking him dinner, and giving him a bath. (AR 778). She stated that she performs household chores, including laundry, cooking, making beds, vacuuming, dusting, and cleaning. (Id.). She noted that she has a friend with whom she goes shopping and otherwise

8

spends time during the day. (Id.). Finally, Rock reported that she watches television with good concentration, comprehension, and recall. (Id.). However, she stated that she reads with inconsistent comprehension, concentration, and memory. (Id.).

D.      Hearing Testimony

At the hearing before the ALJ, Rock testified that she is disabled primarily due to chronic low back pain, depression, and anxiety. (AR 35). She testified that she had recently been evicted from her apartment, where she had lived with her seven year old son. (AR 39-40). Prior to her eviction, while her son was at school, Rock would clean the house, do the dishes, walk around her housing complex, and go grocery shopping. (AR 43). When her son returned home, Rock would help him with his homework. (Id.). Rock testified that she does activities with her son, including coloring, painting, watching TV, and going outdoors. (AR 44). She noted that she likes to read and tries to go for walks as much as she can. (Id.).

Rock testified that she took oxycontin three times a day and neurontin four times a day. (AR 45). She also took oxycodone, but noted that her doctor was weaning her off of it because she did not take that much. (Id.). Rock explained that she was unable to work because she cannot do any lifting, and cannot sit or stand for long periods of time. (AR 48).

Rock testified that her back pain had gotten worse since her July 2010 accident. (AR 49). She stated that she experienced constant pain in her lower back, particularly on the left side. (AR 49). She stated that her pain was typically a six or seven out of ten. (AR 50). She explained that her medication helped alleviate some of the pain but that she did not push herself because of the pain. (Id.). She stated that she can stand for only fifteen to twenty minutes at a time, walk for ten to fifteen minutes at a time, and sit for ten to fifteen minutes at a time. (AR 50-51). On a typical day, she alternates between sitting and standing/walking, but has to lie

down if her pain becomes too much.  (AR 51).  She usually lies down three or four times a day for twenty to thirty minutes at a time.  (Id.).  Rock testified that she can lift ten pounds, but is unable to lift from the ground.  (Id.).  She has trouble with stairs, particularly on her left side, and tries not to bend or stoop.  (AR 51-52).

With respect to her mental impairments, Rock testified that her anxiety and depression also had gotten worse over time.  (AR 52).  She stated that she has a hard time with large groups of people, but can deal better with smaller groups.  (Id.).  She noted that she takes Klonopin for her anxiety and depression, which helps lessen her symptoms.  (AR 53).  She also noted that she takes Adderall, which helps with her concentration and energy level in the morning.  (Id.).  She testified that sometimes she will fall into depression and does not want to talk to anyone.  (Id.).

## II.     STANDARD OF REVIEW

A court may not disturb the Commissioner's decision if it is grounded in substantial evidence.  See 42 U.S.C. §§ 405(g), 1383(c)(3).  Substantial evidence is such relevant evidence as a reasonable mind accepts as adequate to support a conclusion.  Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).  The Supreme Court has defined substantial evidence as "more than a mere scintilla."  Richardson v. Perales, 402 U.S. 389, 401 (1971).  Thus, even if the administrative record could support multiple conclusions, a court must uphold the Commissioner's findings "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion."  Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (citation and internal quotation marks omitted).

The resolution of conflicts in evidence and the determination of credibility are for the Commissioner, not for doctors or the courts.  Rodriguez, 647 F.2d at 222; Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 141 (1st Cir. 1987).  A denial of benefits, however, will

not be upheld if there has been an error of law in the evaluation of a particular claim.  See

Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996).  In the end,

the court maintains the power, in appropriate circumstances, "to enter . . . a judgment affirming,

modifying, or reversing the [Commissioner's] decision" or to "remand [ ] the cause for a

rehearing." 42 U.S.C. § 405(g).

III.    ANALYSIS

        An individual is entitled to DIB benefits if, among other things, she has an insured status

and, prior to its expiration, is disabled.  See 42 U.S.C. § 423(a)(1)(A), (E).  Entitlement to SSI,

on the other hand, requires a showing of both disability and financial need.  See 42 U.S.C. §

1381a.  Rock's insured status, for purposes of DIB, and her need, for purposes of SSI, are not

challenged.

        A.      Disability Standard And The ALJ's Decision

        The Social Security Act (the "Act") defines disability, in part, as the "inability to engage in

any substantial gainful activity by reason of any medically determinable physical or mental

impairment which . . . can be expected to last for a continuous period of not less than twelve

months."  42 U.S.C. § 423(d)(1)(A); see also 42 U.S.C. § 1392c(a)(3)(A) (similar).  An

individual is considered disabled under the Act

        only if his physical and mental impairment or impairments are of such severity that
        he is not only unable to do his previous work but cannot, considering his age,
        education, and work experience, engage in any other kind of substantial gainful
        work which exists in the national economy, regardless of whether such work exists
        in the immediate area in which he lives, or whether a specific job vacancy exists for
        him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); see generally Bowen v. Yuckert, 482 U.S. 137, 146-

49 (1987).

In determining disability, the Commissioner follows the five-step protocol described by the First Circuit as follows:

> First, is the claimant currently employed? If he is, the claimant is automatically considered not disabled.

> Second, does the claimant have a severe impairment?  A "severe impairment" means an impairment "which significantly limits the claimant's physical or mental capacity to perform basic work-related functions." If he does not have an impairment of at least this degree of severity, he is automatically not disabled.

> Third, does the claimant have an impairment equivalent to a specific list of impairments in the regulations' Appendix 1? If the claimant has an impairment of so serious a degree of severity, the claimant is automatically found disabled.
> . . . .

> Fourth . . . does the claimant's impairment prevent him from performing work of the sort he has done in the past? If not, he is not disabled. If so, the agency asks the fifth question.

> Fifth, does the claimant's impairment prevent him from performing other work of the sort found in the economy? If so he is disabled; if not he is not disabled.

Goodermote v. Sec'y of Health & Human Servs., 690 F.2d 5, 6-7 (1st Cir. 1982).

At step one, the ALJ found that Rock had not engaged in substantial gainful activity since her alleged onset date of July 8, 2010.  (AR 14).

At step two, the ALJ found that Rock had the following severe impairments: mild bulging discs at L5-S1, L3-4, and L1-2 without evidence of mass effect on the exiting nerve roots; extradural cyst at T11-12; L5 vertebral hemangioma; generalized anxiety disorder; depression; and opioid dependence.  (AR 15).

At step three, the ALJ determined that Rock did not have an impairment or combination of impairments that meets or medically equals an entry on the Listing of Impairments.  (Id.).

The ALJ then determined Rock's residual functional capacity ("RFC").  Specifically she found that Rock

has the RFC to perform sedentary work . . . except that she can only occasionally operate foot controls with the right lower extremity.  She is limited to only occasionally climbing, balancing, stooping, kneeling, and crouching, and she can never crawl or climb ladders, ropes, and scaffolds.  [Rock] is limited to the performance of simple, routine tasks, and can tolerate only occasional decision-making and occasional changes in a work setting.  She can have occasional interaction with the general public.  She can perform work around coworkers throughout the day, but can have only occasional interaction with coworkers.

(AR 16-17).

In making this finding, the ALJ considered Rock's testimony as well as the medical evidence and opinions of record.  (See AR 18-20).  She explained that, although Rock's medically determinable impairments could reasonably be expected to cause the alleged symptoms, her statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely credible.  (AR 18).  Turning to the objective medical evidence, the ALJ acknowledged Rock's fall and August 6, 2010 MRI.  (Id.).  She listed Rock's medication regimen.  (Id.).  She also cited to medical findings from Rock's July 28, 2010, October 18, 2011 and early 2013 examinations, as well as to Dr. Shin's January 2012 examination notes.  (Id.).  With respect to the medical opinions of record, she afforded "some weight" to the opinions of Drs. Goswami and Weiner, but "little weight" to the opinions of Drs. Mashali and Warren, and Ms. Karno.  (AR 20-21).[12]

At step four, the ALJ found, based on testimony from the VE, that Rock was unable to perform any past relevant work.  (AR 21-22).  She determined that the VE's testimony was consistent with the Dictionary of Titles ("DOT") pursuant to SSR 00-4p.  (AR 22).

---

[12]  The ALJ noted that Rock has a significant history of substance abuse, specifically opioid abuse, and that the record suggests instances of drug-seeking behavior.  (AR 20).  However, she found that the objective medical evidence did not support a disability finding even when considering the impairments associated with or impacted by Rock's substance abuse.  (AR 20).  Rock does not dispute this finding.

13

At step five, the ALJ found that, based on Rock's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Rock can perform. (AR 22). Specifically, she relied on testimony from the VE and concluded that Rock would be able to perform the requirements of representative occupations such as shipping checker, billing clerk, and order checker. (AR 22-23).

Accordingly, the ALJ concluded that Rock was not disabled from her alleged onset date of July 8, 2010, through the date of the ALJ's decision, March 22, 2013. (AR 23).

B.      Rock's Challenges To The ALJ's Decision

Rock argues that the Court should reverse or remand the ALJ's decision on the grounds that she (1) failed to properly evaluate the opinion of Rock's treating physician, Dr. Mashali; (2) improperly evaluated Rock's credibility; and (3) failed to properly determine Rock's RFC. Docket No. 18 at 1.[13]

1.      *Dr. Mashali's Opinion*

Rock avers that the ALJ failed to give the appropriate weight to Dr. Mashali's opinion. Id. at 10.

Although not required to do so, see Arroyo v. Sec'y of HHS, 932 F.2d 82, 89 (1st Cir. 1991), an ALJ generally gives "more weight to the opinions from [the claimant's] treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [his/her] medical impairments." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). A treating source's opinion is entitled to controlling weight when it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record. Id. However, "[t]he law in this

---

[13]   Rock raised a fourth argument in her pleadings, namely that the Commissioner did not meet her burden of proof at step five. Docket No. 18 at 13-15. However, Rock explicitly waived this argument at the February 27, 2014 hearing.

circuit does not require the ALJ to give greater weight to the opinions of treating physicians."
Arroyo, 932 F.2d at 89.

When a treating source's opinion is not given controlling weight, the ALJ must determine the amount of weight it should receive based on factors that include the length of the treatment relationship, the nature and extent of the source's relationship with the applicant, whether the source provided evidence in support of the opinion, whether the opinion is consistent with the record as a whole, and whether the source is a specialist in the field.  Gagnon v. Astrue, No. 11-10481-PBS, 2012 WL1065837, at *5 (D. Mass. Mar. 27, 2012); 20 C.F.R. §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6).  An ALJ is required to provide specific reasons for his determination of the weight given a treating source's opinion.  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  This decision must be supported by the evidence in the case record and "must be sufficiently specific to make clear to any subsequent reviewers the weight the [ALJ] gave to the treating source's medical opinion and the reasons for that weight given to the treating source's medical opinion."  SSR 96-2p, 1996 WL 374188.  "Not only must the adjudicator's reasons be specific, they must also be supportable, and offer a rationale that could be accepted by a reasonable mind."  Hobart v. Astrue, No. 11-151, 2012 U.S. Dist. LEXIS 32700, *21 (D.N.H. February 9, 2012) (internal citations omitted).  Even if an ALJ determines that a treating opinion is not entitled to controlling weight, a treating source's medical opinion is still entitled to deference.  SSR 96-2p.

Here, the ALJ found that Dr. Mashali's opinion was not entitled to controlling weight because it was inconsistent with other substantial evidence of record.  (AR 21).  Specifically, the ALJ found that the opinion was inconsistent with Rock's hearing testimony, her activities of daily living, her conservative treatment, and the physical examinations in the record.  (Id.).  On this basis, the ALJ afforded Dr. Mashali's opinion little weight.  (Id.).

The ALJ's findings are supported by substantial evidence.  At the hearing, Rock stated that she performs household chores including laundry, cooking, making beds, and cleaning; cares for her young son; spends time with a friend during the day; goes shopping with her friend; and goes for walks.  (AR 19).

As for the medical evidence, the ALJ found that Dr. Mashali's opinion was inconsistent with other examinations in the record.  (AR 21).  She noted that in July 2010, Rock exhibited normal range of motion in her neck with no tenderness, showed 5/5 strength in her upper extremities, and reported that her pain had improved.  (AR 18, 688).  She noted that on October 18, 2011, Rock displayed normal gait and station, normal range of motion in all extremities, normal strength and muscle tone in all extremities, and only a slight decrease in range of motion in her lumbar spine.  (AR 18, 869).  The ALJ noted that in January 2012, Dr. Shin found that Rock's strength was 5/5 throughout, that she had no problems with her sensation, and that her gait was normal.  (AR 19, 957).  He also recommended that Rock seek physical therapy for her pain, and stated that Rock did not require a neurological follow-up.  (AR 957).  The ALJ further stated that, throughout 2013, physical examinations have shown pain and tenderness in Rock's back, with decreased range of motion and muscle spasms, but that her muscle strength was 5/5 and there was no evidence of nerve root damage.  (AR 19, 1316, 1319, 1322, 1325).

The ALJ also properly examined Rock's course of treatment, which she found to be routine and conservative.  (AR 19).  The ALJ noted that Rock had not required hospitalization or surgery for her symptoms, and that she had not been to physical therapy for her back pain.  (Id.). She also noted that Rock's treatment had been effective.  (AR 19-20).  With respect to Rock's physical impairments, the ALJ specifically cited the treatment notes indicating that Rock's

medication helps relieve her pain and/or provides adequate pain control.  (AR 20, 752, 1024, 1368).

The ALJ also found that other medical opinion evidence was inconsistent with Dr. Mashali's opinion.  The ALJ considered and assigned some weight to Dr. Goswami's opinion that Rock was limited to light work with some postural limitations.  (AR 20, 351-57).  The ALJ also expressly referenced and gave some weight to the opinion of Dr. Weiner, who explained that Rock had only a 4% impairment of her whole person.  (AR 21, 1025).

Rock faults the ALJ for failing to examine all the requisite factors and for substituting her own lay opinion for the findings and opinions of a physician.  Docket No. 18 at 9-10.  These arguments are unpersuasive.  As long as the ALJ provides "good reasons" for the weight given to a treating source opinion, an ALJ need not "slavishly discuss" every factor in his decision. Pelletier v. Astrue, No. 09-10098, 2012 WL 892892, at *4 (D. Mass. Mar. 15, 2012) (citing Moore v. Astrue, No. 06-136, 2007 WL 2021919, at *6 (D. Me. Jul. 11, 2007); 20 C.F.R. §§ 404.1527(c), 416.927(c).  Among the factors an ALJ may consider is whether a source opinion is consistent with the record as a whole.  20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4).  Moreover, while the ALJ may not ignore medical evidence or substitute her own views for uncontroverted medical opinion, the ALJ must weigh the evidence and resolve conflicts in the testimony. Cohen v. Astrue, 851 F. Supp. 2d 277, 281 (D. Mass. 2012) (internal citations and quotations omitted).

Here, the ALJ did not explicitly analyze Dr. Mashali's opinion against the requisite factors.  (See AR 21).  However, the ALJ identified Dr. Mashali as a treating source and examined his opinion, but found it inconsistent with other substantial evidence of record.  (AR 21).  In reaching this conclusion, the ALJ specifically identified and discussed the contrary

medical and non-medical evidence noted above.  (AR 18-21).  The Court therefore finds that the ALJ articulated sufficiently "good reasons" for discounting Dr. Mashali's opinion and properly discharged her duty to resolve conflicts in the evidence.

Accordingly, the Court finds that there is substantial evidence supporting the ALJ's decision to afford Dr. Mashali's opinion little weight.

2.      *Rock's Credibility*

Rock argues that the ALJ erred in evaluating her credibility.  Docket No. 18 at 10-12.

In evaluating a claimant's symptoms, the ALJ must follow a two-step process: first, he must determine whether there is an underlying medically determinable physical impairment that could reasonably be expected to produce the claimant's symptoms; and if there is then the ALJ must evaluate the intensity and persistence of the claimant's symptoms so that he can determine how those symptoms limit the claimant's capacity for work.  20 C.F.R. § 404.1529(b), (c)(1).

In determining a claimant's RFC, an ALJ must consider a claimant's subjective allegations of functional limitations, but she is not required to take those allegations at face value and may reject them where they are unsupported by the medical evidence, treatment history, and activities of daily living.  See Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 194-95 (1st Cir. 1987); Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 22-23 (1st Cir. 1986); Winn v. Heckler, 762 F.2d 180, 181 (1st Cir. 1985); 20 C.F.R. §§ 404.1529, 416.929; SSR 96-7p, 1996 SSR LEXIS 4.  Specifically, the ALJ must consider the so-called "Avery factors," which are the claimant's daily activities, functional restrictions, non-medical treatment, medications and side-effects, precipitating and aggravating factors, and the nature, location, onset, duration, frequency, radiation, and intensity of the symptoms.  Avery, 797 F.3d at 29.  An ALJ is not required to discuss each of the Avery factors in order to sufficiently support a

credibility determination.  See, e.g., Foley v. Astrue, No. 09-10864, 2010 U.S. Dist. LEXIS 60174, * 21 (D. Mass. June 17, 2010).

If an ALJ determines that a claimant's testimony regarding her symptoms is not credible, the judge "must make specific findings as to the relevant evidence he considered in determining to disbelieve the [claimant]."  Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986); see also Larlee v. Astrue, 694 F. Supp. 2d 80, 85 (D. Mass. 2010).  The determination or decision must "be sufficiently specific to make clear to the individual and to the subsequent reviewers the weight the [ALJ] gave to the individual's statements and the reasons for that weight."  SSR 96-7p, 1996 WL 374186.  An ALJ's credibility determination is entitled to deference, especially when supported by specific findings.  Frustaglia, 829 F.2d at 195.

Rock argues that the ALJ failed to consider "all the factors required," failed to adequately explain her findings, and based her conclusion on a few isolated instances in which Rock was symptom-free.  Docket No. 18 at 11-12.  The Court disagrees.

The ALJ explicitly identified and considered the Avery factors, namely Rock's daily activities; her functional limitations; the nature, duration, and frequency of her symptoms; and her medical treatment.  (AR 19-20).  With respect to her daily activities, the ALJ noted that Rock performs household chores, including laundry, cooking and cleaning.  (AR 19).  She cares for, and does activities with, her son.  (Id.).  She spends time with a friend during the day, shops, reads, and goes for walks.  (Id.).  When Rock met with Dr. Colcher in September 2011, she explained that she engaged in similar daily activities (AR 778-79), and the ALJ was permitted to consider the consistency of such statements with her hearing testimony.  Frustaglia, 829 F.2d at 195 n. 1.[14]

_____

[14]  Rock argues that the ALJ's credibility finding places too much stock in her ability to perform intermittent household activities.  Docket No. 18 at 11.  However, "[w]hile a claimant's

With respect to her functional limitations and symptoms, the ALJ acknowledged Rock's testimony regarding her chronic low back pain, depression and anxiety.  (AR 17-18).  She considered Rock's statements that her pain is typically a 6-7 out of 10, that she has certain postural and lifting restrictions, and that she can only sit, stand and/or walk for limited periods of time.  (AR 18).  The ALJ noted Rock's testimony about her worsening anxiety and depression, and her aversion to large groups.  (Id.).  The ALJ, however, also noted the conflicting medical evidence showing that Rock's strength was 5/5 at numerous times, that her gait and station was consistently normal, and that she retained normal range of motion, particularly in her upper extremities.  (Id.).

The ALJ expressly considered Rock's medical treatment, which she found to be routine, conservative, and effective.  (Id.).  She noted that Rock had not required hospitalization or surgery for her symptoms, and had not been to physical therapy for her back pain.  (AR 20).  She noted Rock's testimony that her medication regimen alleviates some of her pain and lessens the effects of her mental symptoms.  (AR 18).  The ALJ also cited the numerous occasions in which Rock reported to medical providers that her mood or symptoms had improved as a result of treatment and/or medication.  (AR 20).

Accordingly, the Court finds that the ALJ's credibility finding is supported by substantial evidence, is based on specific findings, and is entitled to deference.

---

performance of household chores or the like ought not be equated to an ability to participate effectively in the workforce, evidence of daily activities can be used to support a negative credibility finding.  See Teixeira v. Astrue, 755 F. Supp. 2d 340, 347 (D. Mass. 2010) (citing Berrios Lopez v. Sec'y of Health and Human Servs., 951 F.2d 427, 429 (1st Cir. 1991)).  Here, the ALJ based his credibility finding not only on Rock's ability to perform household chores, but on the entirety of her daily activities and other record evidence.

3.      *Rock's RFC*

Rock argues that the ALJ failed to properly determine her RFC.  Docket No. 18 at 12.

Specifically, she argues that the ALJ's RFC finding is a mere conclusion that lacks reasoning and

citation to specific facts.  Id.  The Court disagrees.

Under the pertinent social security ruling, SSR 96-8p:

> The RFC assessment must include a narrative discussion describing how
> the evidence supports each conclusion, citing specific medical facts (e.g.,
> laboratory findings) and nonmedical evidence (e.g., daily activities,
> observations) . . . . The adjudicator must also explain how any material
> inconsistencies or ambiguities in the evidence in the case record were
> considered and resolved.

SSR 96-8p, 1996 WL 374184.

Here, the ALJ engaged in a detailed narrative discussion that complied with this

directive.  (AR 16-21).  Indeed, for the reasons noted above, the ALJ sufficiently identified and

described the medical and non-medical evidence, weighed such evidence, and resolved conflicts

in the record.

Accordingly, the Court finds that the ALJ's RFC determination is supported by

substantial evidence.

IV.     RECOMMENDATION

For the foregoing reasons, this Court recommends that the District Court deny Rock's

motion to reverse or remand (Docket No. 17) and grant the Commissioner's motion to affirm

(Docket No. 24).

V.      REVIEW BY DISTRICT JUDGE

The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72(b), any

party who objects to these proposed findings and recommendations must file specific written

objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report

and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made, and the basis for such objections.  See Fed. R. Civ. P. 72.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Fed. R. Civ. P. 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation.  See Phinney v. Wentworth Douglas Hosp., 199 F.3d 1 (1st Cir. 1999); Sunview Condo. Ass'n v. Flexel Int'l, Ltd., 116 F.3d 962 (1st Cir. 1997); Pagano v. Frank, 983 F.2d 343 (1st Cir. 1993).


/s/  Jennifer C. Boal
JENNIFER C. BOAL
UNITED STATES MAGISTRATE JUDGE